IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| NATURE'S SUNSHINE PRODUCTS, INC. Plaintiff and Counter Defendant, | ORDER AND MEMORANDUM DECISION |
| vs. | |
| THE SUNRIDER CORPORATION, Defendant and Counter Claimant. | Case No. 2:09-cv-896 |

Plaintiff Nature's Sunshine Products, Inc. (Nature's Sunshine) brought this case against The Sunrider Corporation (Sunrider) alleging several claims stemming from Sunrider's registration and use of domain names that allegedly include Nature Sunshine's federally-registered trademark and Sunrider's sale of goods branded with the trademark. On July 26, 2011, Nature's Sunshine filed a Motion to Enforce Settlement Agreement (Dkt. No. 29).

## BACKGROUND[1]

On April 15, 2011, the parties attended a mediation to attempt to resolve the issues involved in this case. Before the mediation, Joshua Gigger, counsel for Nature's Sunshine, sent an email to Arthur Berger, counsel for Sunrider, in which he stated, "Obviously a mediation only makes sense if each party provides a representative with complete authority to settle. If Sunrider agrees to a mediation, Nature's Sunshine will agree to provide such a representative. Please confirm that Sunrider and Tei-Fu Chen will do likewise." (Ex. 18 to Dkt. No. 37 at 1.) Mr.

---

[1] The history of the trademarks at issue in this case is somewhat lengthy and not relevant to Nature Sunshine's Motion to Enforce. Accordingly, the court does not repeat that history here.

Berger responded, "we do have a person with full authority who can attend the mediation in March." (Ex. 19 to Dkt. No. 37 at 1.) Approximately ten days before the mediation was set to take place, H. Dickson Burton, the mediator, sent a mediation agreement to counsel for both parties for their signature. The mediation agreement contained the condition that "The Parties agree to participate in good faith and will attend with one or more persons who have full settlement authority to resolve the disputes between the parties." (Ex. 20 to Dkt. No. 37 at 1.) Mr. Berger signed this agreement on April 6, 2011.

On April 15, 2011, counsel for Nature's Sunshine and counsel for Sunrider engaged in a full-day mediation. Sunrider's in-house counsel Owen Smigelski attended the mediation. During the mediation, Mr. Smigelski sent updates and discussed the negotiations with Sunrider's International Operations Director Sunny Beutler, who was unable to attend the mediation.

Following the mediation, the parties continued to discuss settlement. On April 16, 2011, Mr. Gigger emailed a draft of the settlement agreement to Mr. Berger. Samuel Straight, also counsel for Sunrider, responded to the email on April 19 with revisions to the agreement. The parties exchanged similar emails on April 22 and 26 and May 4.[2] All of these emails were sent between Mr. Gigger, Mr. Berger, and Mr. Straight.

On May 19, Nature's Sunshine sent an email to Sunrider offering to accept Sunrider's recent revision if Sunrider agreed to one other clarification. Mr. Gigger stated, in relevant part:

---

[2] The terms of the agreement and the revisions made are not relevant to the discussion. Sunrider does not argue that the terms render the agreement unenforceable. Rather, Sunrider contends that the settlement agreement is unenforceable because it is not a signed writing and because Mr. Smigelski, with whom Mr. Berger communicated, did not have authority to enter the agreement.

> As mentioned in my voice message, Nature's Sunshine had an opportunity to discuss Sunrider's most recent changes with international personnel. In short, Nature's Sunshine agrees to all of Sunrider's changes so long as Sunrider will agree to amend Section 4 (trade dress) to confirm our understanding that it applies on an international basis.
>
> If this clarification is agreeable to Sunrider, then the only outstanding issue is Sunrider's labels/marketing materials.

(Ex. 14 to Dkt. No. 31.) Mr. Berger responded the following day: "That's good news. Yes, we can clarify that section 4 concerning trade tress applies internationally. We have asked our marketing people to put together a revised mockup of product label compliant with paragraph 3.e. We should have that on Monday." (Ex. 15 to Dkt. No. 31.) Sunrider then sent Nature's Sunshine a revised product label for Exhibit 1 of the agreement but did not provide any trade dress samples with the revised label for Exhibit 2.

On May 25, Nature's Sunshine sent an email to Sunrider with the final agreement. The email stated:

> Attached are a clean and a redline of what should be the final agreement. Please note, however, that I don't have anything to include in exhibit 2 for the Sunrider trade dress other than the labels that you sent on Monday, which are already included in exhibit 1. Let me know if there is something else that you contemplate being included there. Once this issue is finalized we can revise the Effective Date and distribute for signatures.

(Ex. 17 to Dkt. No. 31.) On June 29, Sunrider refused to sign the agreement unless Nature's Sunshine would agree to limit the scope of the agreement to the United States and permit Sunrider to use the trademark with certain goods in Class 3.

Nature's Sunshine contends that the parties reached a settlement agreement on May 20 when Sunrider agreed to Nature's Sunshine's clarification and did not request any further

changes. It is this agreement, which was sent to Sunrider in final form[3] on May 25, that Nature's Sunshine seeks to enforce. Sunrider argues that the agreement is not enforceable for two reasons: (1) the agreement is not a signed writing as required for all agreements reached in mediation, and (2) Mr. Smigelski, with whom counsel for Sunrider communicated, did not have authority to accept the terms of the agreement.[4] Sunrider alleges that its management had instructed Mr. Smigelski that no settlement could be made without approval from management, that it would not accept a worldwide settlement, and that it must be allowed to use the trademark with skin care products. Although Mr. Smigelski periodically updated Sunrider's management on the negotiations taking place between the parties, he did not share the terms of the agreement with management until May 24. Sunrider then refused to sign the agreement.

## ANALYSIS

"A trial court has the power to summarily enforce a settlement agreement entered into by the litigants while the litigation is pending before it." Untied States v. Hardage, 982 F.2d 1491, 1496 (10th Cir. 1993). Under Utah law, courts will enforce settlement agreements "if the record establishes a binding agreement and 'the excuse for nonperformance is comparatively insubstantial.'" Zions First Nat'l Bank v. Barbara Jensen Interiors, Inc., 781 P.2d 478, 479 (Utah App. 1989) (quoting Tracy-Collins Bank & Trust Co. v. Travelstead, 592 P.2d 605, 609 (Utah 1979)).

Sunrider does not argue that the terms of the agreement allegedly reached on May 20, and

---

[3] The final agreement does not have anything for Exhibit 2, as noted in Mr. Gigger's May 25 email. This was the only remaining piece that needed to be added to the agreement.

[4] In support of its second argument, Sunrider submitted an affidavit from Ms. Beutler, Sunrider's International Operations Director, and Oi-Lin Chen, Sunrider's Vice President.

memorialized in the final agreement sent on May 25, are somehow insufficient to create a binding agreement.

**1. Signed Writing**

Sunrider relies almost exclusively on the Utah Supreme Court's decision in Reese v. Tingey Construction, 2008 UT 7, 177 P.3d 605, for the proposition that the agreement reached in this case must be a signed writing because in arose in the context of mediation. In Reese, the Utah Supreme Court held that "Utah law requires agreements reached in mediation to be reduced to a writing and signed by all the parties to the agreement in order for the agreement to be enforceable by a court." Id. ¶ 15. In reaching this conclusion, the court focused on the confidentiality protections afforded parties to mediation: under Utah Code section 78-31b-8(4), "no person attending an ADR proceeding . . . may disclose or be required to disclose any information obtained in the course of an ADR proceeding, including any memoranda, notes, records, or work product." Utah Code Ann. § 78B-6-208. The court found that it would not be possible to "enforce the terms of an oral agreement reached in mediation without requiring parties to disclose, and the court to consider, confidential settlement negotiations." Reese, 2008 UT 7, ¶ 12.

Sunrider contends that the agreement reached in the May 20 email was a product of the April 15 mediation because the terms of the agreement were initially discussed during the mediation and then filled out and clarified over the course of the following month. For that reason, it is subject to the writing requirement established in Reese.

The court does not agree with Sunrider's broad reading of Reese. The Utah Supreme Court specifically stated its holding as requiring "agreements reached in mediation to be reduced

5

to a writing and signed." Id. ¶ 15. This holding was justified, at least in part, by a concern that enforcing oral agreements would require parties to disclose, and the courts to evaluate, confidential information obtained <u>in the course of</u> the mediation. Here, the agreement was reached over a month after the mediation and only after several email exchanges between Nature's Sunshine and Sunrider. There is nothing in <u>Reese</u> to suggest that the court's holding extends to any agreement reached long after the mediation was over and the parties had continued to engage in settlement negotiations.

Even if the writing requirement in <u>Reese</u> applied to this case, the Utah Supreme Court noted that "a writing via various electronic media, such as an email exchange between the parties in which they agree to particular provisions or a recording in which the parties affirmatively state what constitutes their agreement, would satisfy this requirement." <u>Id.</u> n.6. Sunrider contends that the Utah Supreme Court's use of the word "parties" means that only emails sent between the actual parties, and not counsel, will satisfy the requirement. Again, the court does not agree with Sunrider's interpretation. First, when parties are represented by counsel, rules of ethics require that all communications are directed through the attorneys. Second, Utah courts have enforced settlement agreements based on email communications between counsel, finding the emails evidence that the "<u>parties</u> had reached a meeting of the minds."[5] <u>LD III, LLC v. BBRD, LC</u>, 2009 UT App. 301, ¶ 16, 221 P.3d 867 (emphasis added). Accordingly, even if the settlement agreement needed to be in writing, the emails between Mr. Gigger and Mr. Berger satisfy this requirement.

---

[5] <u>LD III</u> did not involve a settlement agreement reached during mediation, and accordingly did not apply the exception noted in <u>Reese</u>.

**2. Mr. Smigelski's Authority**

Sunrider contends that the agreement is unenforceable because Mr. Smigelski did not have authority to enter into the settlement agreement.

Utah courts recognize that "principals are bound by the acts of their agents which are within the apparent scope of the authority of the agent and a principal will not be permitted to deny such authority against innocent third parties who have so relied on that authority." Forsyth v. Pendleton, 617 P.2d 358, 360 (Utah 1980).

Here, Sunrider represented to Nature's Sunshine that Mr. Smigelski had full authority to settle the case. When the parties were discussing mediation, Mr. Berger told Mr. Gigger that Sunrider had "a person with full authority who can attend the mediation in March." (Ex. 19 to Dkt. No. 37 at 1.) Mr. Berger confirmed this when he signed the mediation agreement, agreeing to "participate in good faith and . . . attend with one or more persons who have full settlement authority to resolve the disputes between the parties." (Ex. 20 to Dkt. No. 37 at 1.) Sunrider then sent Mr. Smigelski as its representative to the April 15 mediation. From this, Nature's Sunshine relied on Mr. Smigelski's authority to fully settle the case. Accordingly, Sunrider is bound by the settlement agreement that its counsel entered with the assistance and feedback of Mr. Smigelski. This is true even though Mr. Smigelski allegedly had secret limitations on his authority.

"Special or secret instructions or limitations upon the authority of an agent . . . must be communicated to the party with whom he or she deals, or the principal will be bound to the same extent as though they were not given." 3 Am. Jur. 2d Agency § 85 (2002). The Second Circuit Court of Appeals applied this principle to facts similar to those here in Omega Engineering, Inc.

v. Omega, S.A., 432 F.3d 437 (2d Cir. 2005). In Omega Engineering the parties attended a settlement conference the day before trial was set to begin. The magistrate judge had ordered that the appropriate persons with settlement authority attend. At the end of the conference, the parties informed the magistrate judge that the case was settled but that the defendants needed two weeks to get the agreement signed and filed. After reviewing the settlement agreement, officers for the defendant company refused to sign the agreement. During the enforcement hearing, the defendant's general counsel testified that he understood the case to be settled, but his authority to settle had been confined within certain limits secretly communicated to him by the principals. The magistrate judge found that counsel had authority to settle the case and that he had done so.

On appeal, the Second Circuit affirmed the magistrate judge's ruling. The court held:

> Regardless of whether [counsel]'s authority to settle had been secretly limited by [defendant], the Settlement Agreement to which he assented is still binding on his employer. Every agent is likely to have secret negotiating limits dictated by the principal, but other parties may safely assume that any agreement the agent agrees to is within his authority unless there is reason to believe he is exceeding it. No limitation of authority was communicated to any of those involved in the settlement at the relevant time.

Id. at 447 (internal citation omitted).

Much like in Omega Engineering,[6] Mr. Smigelski and Mr. Berger attended the mediation

---

[6] Sunrider argues that Omega Engineering is distinguishable in two ways: (1) because the parties in this case never represented to the court that it had reached a settlement, and (2) because the Second Circuit applied Connecticut law, which is different than Utah law. These arguments are not persuasive. First, in evaluating whether the defendant's counsel had authority to settle, the Second Circuit did not rely on the representation made to the magistrate judge that the case was settled. Rather, the Second Circuit focused on the fact that "[n]o limitation of authority was communicated to any of those involved." Id. The same is true in this case. Second, in deciding whether counsel had authority, the Second Circuit did not apply Connecticut law; it cited only a Second Circuit case from New York, International Telemeter Corp. v. Teleprompter Corp., 592 F.2d 49, 55 (2d Cir. 1979), for the proposition that a party is entitled to rely on an agent's

after representing that someone with full authority to settle would be present. At no time during the mediation or the email discussions that took place after did Mr. Smigelski inform Nature's Sunshine that he had limitations on his authority to settle. Because these limitations were never communicated to Nature's Sunshine, Sunrider is "bound to the same extent as though they were not given." 3 Am. Jur. 2d Agency § 85.

## CONCLUSION

For the foregoing reasons, Nature's Sunshine's Motion to Enforce Settlement (Dkt. No. 29) is GRANTED.

SO ORDERED this 21st day of November, 2011.

BY THE COURT:

_____
TENA CAMPBELL
United States District Judge

---

apparent authority when he or she has no reason to believe the agent is exceeding that authority. See id. ("Kirsch, however, was acting within the ambit of his apparent authority and ITC was entitled to rely upon Kirsch's authority so long as there was no reason to believe that he was exceeding it. Teleprompter knew that ITC believed that Kirsch had the requisite authority and did nothing to correct this impression.")